**STATE of Minnesota, Respondent,**

v.

**John Michael LaFORGE, Appellant.**

**No. C6–82–1576.**

Supreme Court of Minnesota.

April 6, 1984.

C. Paul Jones, State Public Defender, Kathy King, Asst. Public Defender, Minneapolis, for appellant.

Hubert H. Humphrey, III, Atty. Gen., Norman B. Coleman, Jr., James B. Early, Sp. Asst. Attys. Gen., St. Paul, Thomas Keyes, Beltrami County Atty., Bemidji, for respondent.

Considered and decided by the court en banc without oral argument.

AMDAHL, Chief Justice.

The issues presented in this case arose out of a nonviolent, antinuclear war demonstration organized by defendant, John LaForge, at Bemidji State University on January 28, 1982. LaForge was arrested and charged with violations of Minn.Stat. § 624.72 (1982) (interference with the use of public property, a gross misdemeanor) and Minn.Stat. § 609.595 (1982) (criminal damage to property, a misdemeanor). After a *Jens Olsen* hearing [1] in which separate trials and separate counsel were waived by LaForge and his two codefendants, LaForge was found guilty on both counts. His two codefendants were found guilty on only one count—misdemeanor criminal damage to property. LaForge was sentenced to a 6-month term on the first count (interference with the use of public property) and 90 days in the county jail on the second count (criminal damage to property). The sentences were to run concurrently but execution was stayed on both counts. The terms of LaForge's 2-year probation included 40 hours of public service on each count, full restitution, and a fine of $250. LaForge's motions for a judgment n.o.v. or for a new trial on the gross misdemeanor charge were denied. His probation was subsequently revoked on March 28, 1983, for failure to report to his probation officer, failure to obtain permission to leave the state, and failure to obey all state and federal laws and local ordinances. The sentences were executed.

The occasion for the demonstration was a Career Day held in the Beaux Arts Ballroom of the student union building on the Bemidji State University campus. The university had reserved a large room (60' by 90') for the day so that exhibitors from business and industry could provide students with career information. The activities were advertised as open to the public and the schedule for the day was made public prior to Career Day. Officials at the school had heard rumors that a demonstration was planned against one of the participants, Sperry Univac, a large defense contractor. Representatives of the university and the Bemidji Police Department met the day before to determine their course of action. Prior to this meeting no regulations with regard to demonstrations had been promulgated by the university. As a result of the meeting officials drafted and adopted demonstration guidelines.

On the morning of the demonstration LaForge was given copies of the drafted regulations and was told that demonstrations were permitted in the lobby, lounge areas, and entryways of the student union building but not in the reserved spaces. LaForge testified that he had no prior knowledge of these rules. After he received the regulations LaForge tried to meet with the demonstrators but "everyone was spread out." The others therefore did not have time to read the regulations and had no knowledge of them.

The schedule of events for Career Day had been widely posted. LaForge knew in advance that a lunch for the exhibitors and organizing personnel had been scheduled at noon in the room next to the ballroom. He testified, "I wasn't certain of the lunch period, whether that constituted a reservation," and he also stated at trial that they had chosen noon for the demonstration for the purpose of accommodating as many demonstrators as possible and "as a matter of convenience for as many students as possible in accordance with their schedules."

When the demonstrators began arriving at 11:45 lunch was announced and a majori-

1. *See State v. Olsen*, 258 N.W.2d 898 (Minn. 1977), in which this court adopted a procedure to ensure that defendants are fully informed of the consequences of dual representation of codefendants by a single attorney prior to waiving their right to individual representation.

ty of the approximately 50 to 100 persons in the ballroom left. Technically, the room was closed during the lunch period but there were no restraints at the door and the Sperry Univac booth was left unattended. LaForge stated at trial that the demonstration began right after lunch was announced even though it was not yet noon because he was not aware of the exact time. He admitted knowing that the Beaux Arts Ballroom was a "reserved" room under the rules. He admitted having had the intent to pour blood on the Sperry Univac materials. He also admitted having known at the time what the regulations were and that the ballroom was reserved. But he did not admit having had the intent to interfere with the Career Day activities.

After LaForge read a speech he reached between the five security employees who had lined up in front of the Sperry Univac table and he poured blood from a vial onto the materials. A cloaked figure representing the specter of death read a dialogue which verbally simulated a nuclear attack. LaForge fell to the floor and feigned death in the center of the room about 12 feet from the display tables. LaForge was asked to leave five times but he ignored those requests until finally he stated, "I think I'll tell the Judge." He and two of the demonstrators were then arrested for their refusal to leave.

The Career Day program resumed at 1:15. A videotape was made of the entire demonstration and was shown to the jury during LaForge's trial.

LaForge is only appealing his conviction under Minn.Stat. § 624.72 (1982) which has been called the "Morrill Hall" Act since it was promulgated in 1969 after the student antiwar demonstrations at the University of Minnesota. The act gives public officers having supervision over public property (which includes Bemidji State University) the authority to promulgate reasonable rules and regulations in order to protect the "free, proper and lawful access to, egress from and proper use of public property and * * * [to protect] the conduct of public business * * * free from interfer-

ence, or disruption or the threat thereof * * *." Minn.Stat. § 624.72, subd. 3 (1982). Violation of such a rule or regulation "which has been published or posted, or announced in a reasonable manner at the time of such conduct shall be prima facie evidence of intent to violate this section." Minn.Stat. § 624.72, subd. 4 (1982). It is a gross misdemeanor to *"intentionally*, or through coercion, force or intimidation, deny[ies] or interfere[s] with the lawful right of another to the free access to or egress from or to use or remain in or upon public property or in like manner interfere[s] with the transaction of public business therein * * *." Minn.Stat. § 624.72, subd. 5 (1982) (emphasis added).

The rules presented to LaForge on the morning of the demonstration declared, "The Hobson Memorial Union permits peaceful demonstrations and protests in *nonreserve* rooms. These areas include the ballroom lobby, hallways, and lounge areas."

The trial judge instructed the jury that the elements of the crime of interference with public property were that LaForge must have intentionally interfered with the transaction of public business on January 28, 1982, and that "intentionally" meant the "actor either has a purpose to do the thing or cause the results specified or believes that his act if successful, will cause that result. The actor must have knowledge of those facts which are necessary to make his conduct criminal and which are set forth after the word 'intentionally'."

After quoting Minn.Stat. § 624.72, subd. 5 (1982), the judge instructed:

[I]f you find from the evidence that this rule of the University was published, posted, or announced in a reasonable manner to the Defendant, John LaForge, and that John LaForge violated such rule as laid down by the University with respect to demonstrations, *you may then find* that the State has established a *prima facie case of intent* to violate the law against interference with the use of public property, *unless you find evi-*

*dence tending to show lack of such intention."* [2]

(Emphasis added).

At trial and in a post-trial motion for judgment n.o.v. or, in the alternative, a new trial, LaForge objected to the portion of the above instruction pertaining to the prima facie effect of a violation of the rule. He did not object to the last phrase of the instruction, "unless you find evidence tending to show lack of such intention." It is that phrase which is now complained of on appeal.

■■ The state argues that by failing to object to the last phrase of the jury instruction, LaForge has waived his right to do so on appeal.[3] Under Minnesota case law and Minn.R.Crim.P. 26.03, subd. 18(3), if a defendant fails to object to the jury instructions at trial, his right to contest them on appeal is waived. But the same section of the rules provides that, "An error in the instructions with respect to fundamental law or controlling principle may be assigned in a motion for a new trial though it was not otherwise called to the attention of the court." *Id.* We deem this particular jury instruction, as a whole, to constitute error as to fundamental law and hence we are not precluded from addressing it.

The State insists that LaForge should not be allowed to create a cannot lose situation by acquiescing in the instructions and hoping for acquittal while retaining the option to appeal the instructions after conviction.

The Michigan court in *People v. Wright,* 408 Mich. 1, 289 N.W.2d 1 (1980), took the following position with regard to the same issue:

> However, failure to object should not be made a basis for denying relief in these cases. General instructions of this kind may be part of a judge's customary litany and not the subject of conference discussion with counsel before being given. Unless counsel has become conversant with the judge's customary instructions, the instruction may be given before he has an opportunity to object. Once given, the damage may be irremediable because the judge must repeat the instruction to identify it and then caution the jury to disregard it. Many defense lawyers may regard "cure" by a corrected instruction as no better and perhaps worse than the injury.
>
> Depending on defense objection and assessing case-by-case the harm resulting from the instruction may inadequately deter continued use of the instructions.

408 Mich. at 30, 289 N.W.2d at 11 n. 13. These considerations mandate that we not insist that a defendant argue to the lower court the legality of each phrase of an instruction in order for the instruction as a whole to be attacked on appeal.

Accordingly, we are faced with the following issues:

1. whether the jury instruction complained of is a permissive or a mandatory presumption;

2. whether the portion which amounted to a *Mann* [*v. United States,* 319 F.2d 404 (CA 5 1963)] instruction unconstitutionally shifted the burden of proof to LaForge; and

---

**2.** In giving the portion of the jury instruction that dealt with "prima facie" evidence of intent the trial judge was following the language of Minn.Stat. § 624.72, subd. 4 (1982), which states that violation of such reasonably promulgated rules shall be "prima facie" evidence of intent to violate *this section.* The parties have not argued the constitutionality of this portion of the statute. We therefore do not address the question. However, we do harbor grave doubts as to its constitutionality, especially in light of the use of the mandatory "shall."

**3.** Generally, if an issue with regard to a jury instruction was raised by a defendant in a motion for judgment n.o.v., its denial preserves the issue for appeal. *See United States v. Schilleci,* 545 F.2d 519 (5th Cir.1977). Interestingly, *Sandstrom v. Montana,* 442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979) was *the only one of* the pivotal cases discussed *infra* in which an objection was made to the jury charge when given.

3. whether the presumption violated LaForge's right to due process and constitutes reversible error.

■ The United States Supreme Court has dealt with presumptions and inferences in jury instructions in three pivotal cases since 1979. In *Sandstrom v. Montana,* 442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979), the Court stated that the "threshold inquiry in ascertaining the constitutional analysis applicable to this kind of jury instruction is to determine the nature of the presumption it describes." 442 U.S. at 514, 99 S.Ct. at 2454. Whether the instructions violated the due process rights of the defendant depends upon how a reasonable juror could have interpreted the instruction. *Id.* Therefore careful attention must be given to the words actually spoken to the jury.

■ In *County Court of Ulster County v. Allen,* 442 U.S. 140, 99 S.Ct. 2213, 60 L.Ed.2d 777 (1979), the Court explained the differences between inferences and presumptions. These evidentiary devices are used by the trier of fact to determine an ultimate fact (an element of the crime) from the existence of other basic or evidentiary facts. In a criminal case the test of the device's constitutional validity depends upon whether the factfinder's responsibility to find the ultimate facts beyond a reasonable doubt has been undermined. 442 U.S. at 156–60, 99 S.Ct. at 2224–26.

■ A permissive presumption or inference allows but does not require the factfinder to infer the "elemental" fact from proof of the "basic" fact. The basic fact then "may constitute prima facie evidence of the elemental fact," *id.* at 157, 99 S.Ct. at 2224, as long as no burden of any kind is placed on the defendant. Such a presumption or inference is unconstitutional *only* "if, *under the facts of the case,* there is no rational way the trier could make the connection permitted by the inference." *Id.* (emphasis added).

■ A mandatory presumption or inference, however, tells the trier of fact that the elemental fact *must* be found upon proof of the basic fact unless the defendant presents some evidence to rebut the presumption or inference. Some types of mandatory presumptions may merely shift the burden of producing "any evidence" to the defendant, after which the burden of persuasion reverts to the state. *Id.* at 157–59 n. 16, 99 S.Ct. at 2224–26 n. 16. The *Ulster County* decision held that in such cases it may be appropriate to analyze such a presumption as a permissive inference. There must be ample evidence in the record other than the presumption to support a conviction. *Id.* at 160, 99 S.Ct. at 2226.

■ Another class of mandatory presumptions, however, entirely shifts the burden of proof to the defendant. If the trier of fact is forced to apply the presumption "and may not reject it based on an independent evaluation" of the facts presented by the State then the constitutionality of the presumption is based not upon an evaluation of the evidence in the record but upon the "presumption's accuracy in the run of cases." *Id.* at 159, 99 S.Ct. at 2226.

The presumption at issue in *Ulster County* was held to be a permissive one because the trial judge had made it clear that "the presumption was merely a part of the prosecution's case," *Id.* at 160, 99 S.Ct. at 2226, and that it could be ignored by the jury "even if there was no affirmative proof offered by defendants in rebuttal." *Id.* at 161, 99 S.Ct. at 2227. The judge had said that the jury *"may* infer and draw conclusions," *Id.* at 161 n. 20, 99 S.Ct. at 2227 n. 20, of constructive possession of the weapons and drugs found in the car but that the presumption need not but *may* be rebutted by evidence or lack of evidence in the case. The Court found evidence that the jury clearly understood that it could reject the presumption because the jury found constructive possession of the weapons but not of the drugs even though the instructions as to both were identical. *Id.* at 162 n. 23, 99 S.Ct. at 2227 n. 23.

In contrast, the instruction in *Sandstrom* which stated that "the law presumes that a person intends the ordinary consequences of his voluntary acts," 442 U.S. at

514, 99 S.Ct. at 2454, was found to be a mandatory presumption because the jurors were not told that the presumption could be rebutted, that they had choice whether or not to apply the presumption, or that the presumption was limited to a shift in the burden of production rather than of persuasion. *Id.* Since a reasonable juror could easily have interpreted the instruction as either an irrebuttable presumption of intent once the basic facts were proven *or* as a shifting of the burden of persuasion as to the element of intent to the defendant, the instruction was held to be a mandatory presumption. The Supreme Court explicitly stated that the *potential* for either interpretation was not negated by the other instructions which stated generally that the accused was presumed innocent until proven guilty and that the state had the burden of proving beyond a reasonable doubt that the defendant caused the death of the deceased purposely or knowingly. *Id.* at 518–19 n. 7, 99 S.Ct. at 2456–57 n. 7. The jury could have concluded that proof of intent beyond a reasonable doubt could be established by the presumption.

The State argues in this case that the trial judge established only a heavily qualified permissive presumption in saying that the jury "may" then find merely a "prima facie" case of intent. In *State v. Ferraro*, 290 N.W.2d 177 (Minn.1980), the Minnesota Supreme Court refused to find error in an instruction that stated "the jury may reasonably draw the inference" because the jury was also cautioned that they were not required to draw the inference and that they were the sole judges of the evidence. 290 N.W.2d at 179. This was clearly a permissive inference which left the trier of fact free to credit or reject the information. But the use of the permissive "may" in our case is complicated by the addition of the phrase "prima facie evidence."

In *State v. Odom*, 83 Wash.2d 541, 520 P.2d 152 (1974), the jury instruction said that the fact that the defendant was armed with a pistol but had no license to carry it "shall be prima facie evidence of his intention to commit such a crime of violence." 83 Wash.2d at 544, 520 P.2d at 154. The

same instruction stated that "prima facie evidence" meant evidence which might be accepted for proof of a particular fact. *Id.* If this definition applies, there is no difference between saying "prima facie" evidence of intent and a "presumption of intent" because the burden in both instances then shifts to the defendant.

The First Circuit, in *United States v. DeVincent*, 546 F.2d 452 (1st Cir.1976), was presented with an instruction that read "if it is shown that all \* \* \* factors were present \* \* \* there is prima facie evidence that the extension of credit was extortionate \* \* \*." 546 F.2d at 454. The court observed that "prima facie" is logically distinct from "presumption" and that "[i]n an ideal statute, the two terms would have distinguishable meanings." *Id.* at 455, 455 n. 3. But since "Congress has not always observed the distinction in the past and we have no assurance that this statute was drawn with it in mind," the court treated the instruction as a mandatory presumption. *Id.* at 455 n. 3.

■ "Prima facie" is a legal term of art that no juror can be expected to understand as meaning anything but a shift in the burden of proof unless the trial judge carefully defines the term. No such definition was given in the case at hand so we too will treat it as a mandatory presumption.

The general rule has been that "a single instruction to a jury may not be judged in artificial isolation, but must be viewed in the context of the overall charge." *Cupp v. Naughten*, 414 U.S. 141, 146–47, 94 S.Ct. 396, 400–01, 38 L.Ed.2d 368 (1973) (citation omitted); *Accord State v. Parker*, 282 Minn. 343, 358, 164 N.W.2d 633, 642 (1969). But the *Cupp* court also added that "this does not mean that an instruction by itself may never rise to the level of constitutional error." 414 U.S. at 147, 94 S.Ct. at 400 (citation omitted). In this case the judge did instruct the jury, prior to the instruction at issue, that defendants are presumed to be innocent and must be proven guilty beyond a reasonable doubt. He also stated

that the burden of proving guilt was on the State, that defendants did not have to prove their innocence, and that the jurors were the sole judges of the credibility and truthfulness of the witnesses and the weight to be given to their testimony. Additionally, he stated that the instructions were to be considered as a whole in the light of all the others. In *Sandstrom*, however, the same general instructions were held not to have removed the potential that the jury interpreted the instructions as a mandatory presumption. 442 U.S. at 518–19 n. 7, 99 S.Ct. at 2456–57 n. 7. Moreover, in the recent Minnesota case of *State v. Williams*, 324 N.W.2d 154 (Minn. 1982), a lack of qualifying instructions to the effect that the jury could consider the explanation or that it could disregard the presumption was important to the finding that the instruction given was "tantamount to an irrebuttable presumption that denies due process." *Id.* at 160 citing *Sandstrom v. Montana*, 442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979). This court has noted in the *Ferraro* decision that such qualifying instructions would prevent the jury from confusing a permissive inference with a mandatory presumption. 290 N.W.2d at 179. The lack of such qualifying instructions in this case and the use of the term "prima facie" offsets the use of the permissive word "may" and tilts the analysis of this instruction towards a finding that the jury might *possibly* have regarded the instruction as a conclusive or mandatory presumption.

But an analysis of the final phrase, "unless you find evidence tending to show lack of such intention," is determinative. This language can be seen as either a qualifying instruction such as that regarded favorably in *Ferraro* and *Williams* or as an impermissible shifting of the burden of persuasion to the defendant. The *Sandstrom* instruction did not contain this phrase but similar language has been the subject of much controversy. An equivalent phrase has been termed the *Mann* instruction after the decision in *Mann v. United States*,

319 F.2d 404 (5th Cir.1963). The *Mann* court held that the instruction, "So unless the contrary appears from the evidence, the jury *may draw the inference* that the accused intended all the consequences which one standing in like circumstances and possessing like knowledge should reasonably have expected to result * * *," *Id.* at 407, (emphasis added), equaled a shifting of the burden of proof from the Government to the defendant to prove lack of intent and was unconstitutional. The *Mann* instruction has not been previously addressed by the Minnesota or the United States Supreme Courts. The vice of the *Mann* instruction was described as follows: "When the words, 'So unless the contrary appears from the evidence' were introduced, the burden of proof was thereupon shifted from the prosecution to the defendant to prove lack of intent." *Id.* at 409. In that court's view the inference thereby became a presumption which the defendant had to overcome. This burden of proof was especially harmful because intent is subjective in nature.

The Fifth Circuit again dealt with the *Mann* instruction in *United States v. Chiantese*, 560 F.2d 1244 (5th Cir.1977).[4] Despite the earlier *Mann* decision, trial courts continued to use the faulty instruction. The *Chiantese* court specifically ordered its lower courts to refrain from using any such burden shifting instruction. The court refused to classify giving the charge as error per se and declared the necessity of weighing its harm to the accused. "Such 'weighing,' however, shall not include consideration of whether a defective charge has been cured by prior or subsequent statements." 560 F.2d at 1255.

The Third Circuit, in *United States v. Garrett*, 574 F.2d 778 (3rd Cir.1978), also instructed its trial courts not to use "language in instructions which can reasonably be interpreted as shifting the burden to the accused to produce proof of innocence." 574 F.2d at 783. The court, however, found that the harmful effect of the *Mann* instruction which read "unless the evidence

---

4. *Chiantese* was cited favorably in *Sandstrom*. *See* 442 U.S. at 518, 99 S.Ct. at 2456.

in the case leads you to a contrary conclusion, you *may* draw [the inference]," *id.* at 780 (emphasis added), had been vitiated in that particular case by the jury instructions as a whole which included seven different statements to the effect that the burden is never on the defendant.

Other jurisdictions have recently applied the *Sandstrom* test (whether there is a *possibility* the jurors may have believed the burden shifted to the defendant) to the *Mann* instruction. In *Dietz v. Solem,* 640 F.2d 126 (8th Cir.1981), the instruction stated that intent was presumed unless there was evidence of some other purpose in the mind of the defendant. The court said, "It is apparent that 'other evidence' which might rebut the presumption of intent would only be offered by defendant." 640 F.2d at 131. The instruction was not mitigated by the other instructions given on presumption of innocence, burden of proof, and reasonable doubt and was held unconstitutional.

In *Austin v. Israel,* 516 F.Supp. 461 (E.D.Wis.1981), the phrase "when there are not circumstances to prevent or rebut the presumption," 516 F.Supp. at 463, was found to create the possibility that a "reasonable juror could have utilized the presumption to cast upon the defendant the heavy burden of proving lack of intent." *Id.* at 465. Under *Sandstrom,* it was thus a rebuttable presumption which was a denial of due process.

The *Mann* instruction at issue in *People v. Wright,* 408 Mich. 1, 289 N.W.2d 1 (1980), which read, "unless the testimony satisfies you of something else * * *," 408 Mich. at 11, 289 N.W.2d at 2, was held unconstitutional because it had "the *potential* for misleading the jury with respect to the requirement that the government must prove every element of an offense beyond a reasonable doubt." *Id.* at 24, 289 N.W.2d at 8, *quoting United States v. Robinson,* 545 F.2d 301, 306 (2nd Cir.1976) (emphasis added). Under the above reasoning which

appears to be the majority position today,[5] the instruction given in LaForge's trial amounted to a rebuttable presumption of intent to interfere with the transaction of public business. The presumption arose upon a finding of the "basic" fact that LaForge violated the regulation forbidding demonstrations in nonreserve areas. The jury could reasonably have assumed that the burden of production or even of persuasion then shifted to LaForge. Under *Sandstrom* the possibility of such an interpretation is not cured by the other general instructions given or by the use of the permissive "may," especially in the face of a lack of any further qualification by the trial judge.

The due process requirement established in *In re Winship,* 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970), is that the prosecution must prove "beyond a reasonable doubt * * * every fact necessary to constitute the crime * * * charged." 397 U.S. at 365, 90 S.Ct. at 1073. This requirement was said to be "indispensable to command the respect and confidence of the community in applications of the criminal law. It is critical that the moral force of the criminal law not be diluted by a standard of proof that leaves people in doubt whether innocent men are being condemned." *Id.* at 365, 90 S.Ct. at 1073. In *Mullaney v. Wilbur,* 421 U.S. 684, 95 S.Ct. 1881, 44 L.Ed.2d 508 (1975), Justice Powell held that "fact" in *Winship* meant every element, anything in the definition of the crime that affects the individual's blameworthiness. Minn.Stat. § 624.72, subd. 5, quite clearly establishes a "specific intent" crime. It is a gross misdemeanor to "*intentionally* * * * deny or interfere with * * * free access to or egress from * * * public property or *in like manner* interfere with the transaction of public business." (Emphasis added). In *Morissette v. United States,* 342 U.S. 246, 274, 72 S.Ct. 240, 255, 96 L.Ed. 288 (1952), the Court held that "a presumption which would permit

---

**5.** See *Austin,* 516 F.Supp. at 466, for a lengthy list of the jurisdictions that have criticized the

use of the *Mann* instruction.

but not require the jury to assume intent from an isolated fact would prejudge a conclusion which the jury should reach of its own volition * * *. [T]his presumption conflicts with the overriding presumption of innocence with which the law endows the accused." 342 U.S. at 275, 72 S.Ct. at 256. *Morissette* was reaffirmed first in *United States v. United States Gypsum,* 438 U.S. 422, 98 S.Ct. 2864, 57 L.Ed.2d 854 (1978), and then in *Sandstrom.* Since intent was a disputed element at trial, the prosecution had the burden of proving it beyond a reasonable doubt. In the very recent United States Supreme Court decision in *Connecticut v. Johnson,* ___ U.S. ___, 103 S.Ct. 969, 74 L.Ed.2d 823 (1983), it was decided that a *Sandstrom* error (a conclusive presumption) cannot be deemed "harmless error" except in very rare, narrow circumstances when the issue of intent has been conceded or waived in some manner. The *Connecticut* court stated that "an erroneous presumption on a disputed element of the crime renders irrelevant the evidence on the issue because the jury may have relied upon the presumption rather than upon that evidence." 103 S.Ct. at 977.

▪ Since it cannot be said that the burden of producing evidence of intent is a very low burden, it must be analyzed without looking at the strength of the additional evidence to determine the constitutionality of the presumption.[6] Rather, a rational connection must be established between the basic facts provided and the ultimate fact presumed. The presumption's accuracy in the run of cases must be analyzed. *Ulster County,* 442 U.S. at 160, 99 S.Ct. at 2226. The necessary correlation between the proved fact and the presumed fact has not been shown in this case. There was no showing that any business was being transacted or interfered with over the noon hour. The most that can be said to have

been established by LaForge's disregard of the regulations is that he presumably had the intent to present an opposing political view to an interested audience. An intent to interfere with the transaction of public business or with the ingress to and egress from a public building does not logically flow from the decision to demonstrate in the ballroom as opposed to the hallways. We find that the use of the phrase "prima facie evidence" without defining it and the use of the disputed *Mann* jury instruction may have impermissibly shifted the burden of persuasion to LaForge, in the minds of the jury members as to the crucial issue of intent. Under *Sandstrom* the instruction is therefore unconstitutional and the lower court judgment is reversed.

Reversed.

---

6. The fact that the jury viewed the entire demonstration on videotape is an indication that there was some evidence of intent to interfere with the use of public property. But even in *Connecticut v. Johnson,* the court agreed that the presumption had been unnecessary because "the evidence was sufficient for a properly instructed jury to find the requisite intent." 103 S.Ct. at 977 n. 15. There is contrary evidence, moreover, in the fact that lunch hour was the time chosen for the demonstration when it was known that public business was to be suspended.