**STATE of Minnesota, Respondent,**

v.

**Christopher J. EARL, Appellant.**

No. A04–1328.

Supreme Court of Minnesota.

Aug. 11, 2005.

Rehearing Denied Sept. 1, 2005.

John M. Stuart, State Public Defender, Benjamin Jon Butler, Asst. Public Defender, Minneapolis MN, for Appellant.

Gaylord A. Saetre, Todd County Attorney, Long Prairie MN; and Kimberly Ross Parker, Assistant Attorney General, St. Paul MN, for Respondent.

## OPINION

HANSON, Justice.

Appellant Christopher Jacob Earl appeals his conviction of ten counts of first-degree murder in connection with the April 28, 2003, deaths of Hollis Chromey and her children, Jerrod and Katie Zapzalka, in Long Prairie, Minnesota. Earl bases his appeal on four issues: (1) whether the district court erred in admitting into evidence Earl's statement to police, taken after appellant had invoked his right to counsel; (2) whether the jury instructions misstated the state's burden of proof on accomplice liability; (3) whether the evidence was sufficient to convict Earl of aiding and abetting first-degree murder while committing kidnapping or while committing criminal sexual conduct; and (4) whether seven of Earl's convictions must be vacated because he may only be formally adjudicated guilty of a maximum of one count of first-degree murder for each victim. We affirm Earl's convictions of first-

degree murder while committing kidnapping of Chromey and Jerrod Zapzalka (Counts 7 and 9) and first-degree murder while committing criminal sexual conduct of Katie Zapzalka (Count 10), but vacate the other seven convictions (Counts 1 through 6 and 8).

Early on April 28, 2003, Jonathan Carpenter and Earl drove to Long Prairie from the Twin Cities with masks, gloves, electrical tape, heavy flashlights, and a BB gun that was a replica of a rifle. They planned to steal from a specific home, but were unable to locate it. Rather than drive away empty-handed, they randomly selected the Chromey home and, shortly after 3:30 a.m., entered through a side door. They found Hollis Chromey sleeping in the living room on the couch, and her two children, 16–year–old Jerrod Zapzalka and 18–year–old Katie Zapzalka, sleeping in their bedrooms. Carpenter and Earl forced the three victims into the kitchen at gunpoint and bound their wrists and ankles with electrical tape. They then began to search the home for valuables.

Earl testified at his trial and gave the following version of events. Realizing that there was nothing valuable in the Chromey home, Earl stopped searching and began to talk with Chromey. Carpenter told Earl to stand guard by the door and kept searching for a while. When Earl returned to the kitchen, he saw that both of the women were gone. He then noticed Carpenter placing Katie on the bed in her room, and asked what was going on. At that moment, Chromey, who had managed to free herself and Jerrod, emerged from Jerrod's bedroom and attempted to strike Earl with a chair. Earl knocked Chromey backward. Carpenter grabbed the chair and knocked Chromey to the floor, rendering her unconscious. Jerrod went after Carpenter, dislodging his mask. Carpenter hit Jerrod and knocked him out. Car-

penter then stomped on Chromey's and Jerrod's heads. After assaulting Chromey and Jerrod, Carpenter brandished a knife in Earl's face and told him to continue standing guard. At some point, a maul belonging to the Chromey family was used to beat Chromey's and Jerrod's heads.

Carpenter returned to Katie's room and raped her. Earl claimed that he did not witness the rape, but saw Carpenter emerge from Katie's room with a "big grin on his face." According to Earl, Carpenter then used the knife to cut the throats of Chromey, Jerrod, and Katie.

After the killings, Carpenter and Earl discarded two blood-stained knives in the Chromey's microwave and threw the maul onto the couch. Earl testified that they fled to burn their masks, clothing, and gloves. They next drove to Lake Park, Minnesota, where they stayed throughout the day and overnight with Bobbie Gorden, a former girlfriend of Carpenter's, and her husband. On the morning of April 29, 2003, they followed Bobbie into town so she could fill their tank with gas. They returned to her home while it was unoccupied, taking two handguns, a shotgun, a holster, brass knuckles, handcuffs, CDs, DVDs, and jewelry. They then drove back to the Twin Cities.

On April 30, 2003, Robert Jorgenson went to the Brooklyn Park police, informing them that Earl had told him that Earl and Carpenter had killed a family up north over the weekend. Jorgenson, a security guard who frequented a convenience store where Earl worked, said that Earl told him that a burglary had gone bad, that the mother and son had fought back, and had revealed one of their masked faces, and that "we did it," "we tied them up," and "we" killed them with knives. Earl also told Jorgenson he had committed certain other crimes. Earl informed Jorgenson that he and Carpenter would be at Car-

penter's father's house for the day, and Jorgenson and Earl had discussed Jorgenson going to the police with the information.

A high-risk warrant-execution team entered the Carpenter home in Minneapolis that afternoon and found Earl lounging in a chair and Carpenter standing in a bedroom. Both were armed. Outside the Carpenter home, police found Earl's car, which contained physical evidence connecting Carpenter and Earl to the Long Prairie crime and to other burglaries.

Earl was interviewed at the Minneapolis Police Department. He initially invoked his right to counsel but after a later discussion with police officers and a second *Miranda* warning, he gave a statement, which was videotaped. In his statement, Earl admitted that he had participated in the burglary in Long Prairie and in several other burglaries in the Twin Cities area.

Earl was indicted on three counts of aiding and abetting first-degree premeditated murder, three counts of aiding and abetting first-degree murder while committing burglary, three counts of aiding and abetting first-degree murder while committing kidnapping, and one count of aiding and abetting first-degree murder while committing first-degree criminal sexual assault.

Before trial, Earl moved for the suppression of his videotaped statement, arguing that it was obtained in violation of his *Miranda* rights. The trial court denied the motion, finding that the *Miranda* warnings were adequate, that Earl voluntarily reinitiated contact after his contacts with the police had ceased, and that Earl's waiver of his right to counsel and subsequent statement were made knowingly and voluntarily.

The state's theory of the case at trial was that Earl actively planned and partici-

pated in the burglary that led to the Long Prairie killings, and that due to his previous association with Carpenter, he could have reasonably foreseen that death could result from the burglary. To support this theory, the state offered evidence of several burglaries Carpenter and Earl had committed, one of which involved the deaths of two people.

Earl's former fiancée, Lisa Madison, testified that Earl and Carpenter had burglarized a home early in the morning of April 6, 2003. She testified that she rode in the car with them, and kept lookout while they committed the burglary. She testified that on the way to the burglary, Earl and Carpenter stopped to buy duct tape, "to tie the people up * * * if there were people in the house." The occupants of the home testified that on April 6, 2003, they were awakened, threatened, and bound by two masked men. The men stole computers, cameras, personal digital assistants, and jewelry. As they left, one of them announced that they were "the Jack Boys." Madison also stated that Earl discussed his plans to burglarize the Long Prairie house with her. She testified that Earl shaved his head before leaving for Long Prairie, and told her he did it so that he would not leave DNA evidence at the scene.

Jorgenson testified that Earl told him that Carpenter had also killed an elderly Minneapolis man and his disabled daughter. These killings had occurred two weeks before the Long Prairie killings. Earl told Jorgenson that he helped clean up the crime scene and removed valuables and cash, which Earl later testified amounted to $16,000. Madison testified that she was in the getaway car after this burglary and that Earl was so excited about the amount of money he and Carpenter had taken that he began throwing it

around the car, kissed Carpenter's hands, and told him he was "the man."

Erica Overlie, Carpenter's former girlfriend, testified that Carpenter had overheard her parents say that her grandparents had guns. Earl testified that Overlie had said that her grandparents were always away from home on Sunday mornings. Overlie's grandmother testified that two masked and gloved men entered her home in New London, Minnesota, on April 27, 2003, the Sunday after Easter. When she asked them what they wanted, they told her they had the wrong home and left.

Raelynn Jones, with whom Earl briefly lived, testified that Earl approached her and told her that he and Carpenter robbed houses and "we kill people," and asked whether there was anyone she wanted killed. Jones gave them the name and address of her estranged mother, who lived in Long Prairie, and told them they could kill her. Jones testified that later she had a falling-out with Earl and Carpenter and told them to call off their plans.

Sarah Dombrovski, Earl's former workmate, testified that Earl told her that he and Carpenter robbed houses. She stated that Earl told her they looked for unoccupied homes, but that if anyone was there, they had weapons and would "take care of business."

Bobbie and Shane Gorden testified that Earl and Carpenter arrived at their Lake Park home at about 7 a.m. on April 28, 2003. They let Earl and Carpenter stay overnight and drove with them into town to buy them cigarettes and enough gas to get back to the Twin Cities. Shane Gorden testified that Earl asked why he had a tear drop tattoo under his eye and whom he had killed to get the tattoo, and Shane responded that he and Bobbie had lost a child, and the tattoo was in memory of the child. According to Shane Gorden, Earl said that he and Carpenter, "should have five, because they had killed five people."

The coroner who investigated the Long Prairie deaths testified about findings as to each of the three victims. Chromey's lips were cut, her nose was fractured, and four teeth were broken, exposing the roots. She had five distinct head wounds inflicted by a maul-type hammer. Her skull was fractured and she sustained brain injury. Her throat was deeply cut, severing her carotid artery and jugular vein and hitting her vertebrae. Jerrod Zapzalka suffered a skull fracture and bleeding of the brain. His throat was sawed, severing the carotid artery, jugular vein, larynx, and the strap muscles on both sides of his neck. Both Chromey and Jerrod died as a result of complex homicidal action, including both the blows to the head and the slit throats. Katie Zapzalka's neck was cut in two places. A first cut severed her larynx but did not kill her. A second cut sawed through her neck to the bone. She died as a result of exsanguination due to sharp-force neck injuries.

The state offered substantial physical evidence to corroborate the witnesses' testimony. Evidence from Earl's car included two bloody flashlights, a walkie-talkie, binoculars, masks, a Minnesota atlas with a route out of Long Prairie marked, a broken section of a golden-toned bracelet, and a used condom containing DNA that matched Carpenter's and Katie's DNA. Evidence from the Chromey home included electrical tape from the victims' bodies, a blood-covered maul, two bloody knives, a used condom that matched Carpenter's DNA, and another section of the golden-toned bracelet. The state also offered physical evidence that Earl and Carpenter had planned and participated in burglaries both before and after the Long Prairie killings. This included pieces of jewelry, DVDs, computers, a video camera and vid-

eotape, strong boxes, and weaponry belonging to the victims, as well as receipts for cars, police equipment, hotel stays, and pawn shop activities.

Earl claimed that he did not participate in the killings, but admitted that he went to Long Prairie with the intention of committing a burglary. Earl testified that he did not attempt to stop the Long Prairie killings or to escape because he panicked and was afraid for his life. He claimed that it was not reasonably foreseeable to him that Carpenter would kill the Chromey family or that he would sexually assault Katie.

At the close of trial, the jury returned guilty verdicts on all ten counts of first-degree murder. The trial judge entered convictions for all counts, and sentenced Earl to three consecutive life prison sentences without the possibility of parole on counts 7, 9, and 10: aiding and abetting first-degree murder of Hollis Chromey while committing kidnapping, aiding and abetting first-degree murder of Jerrod Zapzalka while committing kidnapping, and aiding and abetting first-degree murder of Katie Zapzalka while committing criminal sexual conduct.

## I.

■ Earl claims that police violated his right to counsel by continuing his interrogation after he unequivocally asked to talk to a lawyer. The Minneapolis police took Earl into custody and read him his *Miranda* rights at around 6 p.m. on April 30, 2003. Earl responded, "I think I want to talk to a lawyer first." Earl argues that after he invoked his right to counsel, the police continued contact with him for the purpose of inducing him to revoke his request for counsel and waive his *Miranda* rights. The state does not dispute that Earl invoked his right to counsel, but argues that some time after Earl did so, he reinitiated contact with the police, revoked his invocation of his right to counsel, waived his *Miranda* rights and voluntarily gave a videotaped statement.

The following are relevant excerpts of the exchanges between Earl and Bureau of Criminal Apprehension (BCA) Agents Robert Berg and Bradley Barker after Berg read Earl his *Miranda* rights:

> Berg: Okay. You want to talk to us?
>
> Earl: I think I want to talk to a lawyer first.
>
> Barker: You want to talk to a lawyer first, huh? 'Kay. I think you need one.
>
> Earl: Um-hm.
>
> Berg: Big time. Stand up. Stand up, cuffs back on you.
>
> Barker: How's that for tight? You'll be wearing those for a while.

[Brief exchange about whether Earl needed medical attention.]

> Barker: Just so you know what's going on, you're gonna be sitting here for a little bit, and there's gonna be a squad car from Todd County/Long Prairie that's gonna be coming down here to pick ya up, and that's where you're headed from this point. Um, there's a lot of stuff ahead of ya, and think very hard and fast about what's going on. 'Kay? If you want to talk to us you holler, and we'll talk to you. If not, that's fine too.

After the BCA officers left, Earl sat alone in his interview room, hands cuffed behind him, for approximately 2 hours. Eventually, Earl asked a police officer who came in to photograph him whether he was going to get a chance to "speak to someone." A few minutes later, Earl asked, "Those other two detectives coming back in at all?" At that moment, Robert Berg looked into the room and said "That's Chris, that['s] not Jon." The following exchange occurred:

Earl: So you guys coming back in or what?

Berg: No, you wanted an attorney.

Earl: Well I asked one guy to put the handcuffs in front of me and to have you come back in, he said you'd come back in, but (inaudible).

Berg: We're here now. You want to talk to us?

Earl: Yes I want to talk.

Some conversation about Earl's fiancée ensued, after which the following exchange occurred:

Berg: Chris, uh one of the Minneapolis detectives just came in here and took a photo of you, a Polaroid of you and I just stuck my head in the door and you indicated to me that you had told the officer that came in that removed the handcuffs from the front—er from the back to the front that you wanted us to come back in and talk to you.

Earl: Yes.

Berg: Okay. Um, you understand your rights?

Earl: Yes I do.

Berg: [Repeats *Miranda* warning.] Now at 6 o'clock you were given those uh rights before you indicated that you did want an attorney, it's now 8:07, April 30th, you have to tell us what you want Chris.

Earl: Um, still kind of scared about everything. Are you guys going to be able to watch Lisa so nothing happens to her?

[Conversation about Lisa]

Berg: Let's go back to this attorney deal. Do you now want to talk to us?

Earl: How's this going to help me out, talking to you guys without talking to an attorney?

Berg: We can't tell you, we can't advise you, I'm not going to advise you, now that's a decision—

Earl: But you said you'd be honest with me, and I want to know if it will help. If it—

Berg: Well look at it this way. You know if you were a prosecutor or judge and jury and you had two individuals, one individual that says I made a terrible terrible mistake but I'm willing to accept the consequences and do the right thing, you have the other individual that says, "Go to hell." "Prove it." You know which one do you look more favorably on, it's just kind of common sense.

Earl: Um-hm.

Berg: The only thing that we can tell you is we will make it known to the prosecutor, to the judge, or the jury you know that you did cooperate, but as far as offering you anything or telling you that you're gonna get this or you're not gonna get that we can't do that.

Earl: What are the charges against me?

Berg: Murder. Three times, maybe five.

Thereafter, Earl stated that he was willing to talk to the BCA officers without an attorney present. The officers then took his statement.

■■■■ The state bears the burden to prove, by a fair preponderance of the evidence based on a totality of the circumstances, that an accused "knowingly, intelligently, and voluntarily waived his right to counsel" once *Miranda* rights have been invoked. *State v. Hannon,* 636 N.W.2d 796, 806 (Minn.2001) (citations omitted). We have set forth an extensive list of factors relevant to the totality of the circumstances, including

the defendant's age, maturity, intelligence, education, experience, ability to

comprehend, lack of or adequacy of warnings, length and legality of detention, nature of the interrogation, physical deprivations, and access to counsel and friends.

*State v. Miller,* 573 N.W.2d 661, 672 (Minn.1998).

■ We review the district court's findings of fact as to circumstances surrounding a suspect's statements for clear error. *Id.* However, we make an independent subjective determination as to whether the waiver was voluntary. *Id.*

In *Miranda v. Arizona,* the United States Supreme Court held that a criminal suspect has a right to counsel during custodial interrogations. 384 U.S. 436, 469, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). The Court established a bright-line rule in *Edwards v. Arizona,* where it held:

> [A]n accused, * * * having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police.

451 U.S. 477, 484–85, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981). This court has noted that there are three steps to the *Edwards* analysis. *State v. Munson,* 594 N.W.2d 128, 138–39 (Minn.1999). First, the court must determine whether the suspect invoked his right to counsel during a custodial interrogation. *Id.* at 138. If it is shown that a suspect invoked his right to counsel, "courts may admit responses to further questioning only on finding that [the accused] (a) initiated further discussions with the police, and (b) knowingly and intelligently waived the right invoked." *Id.* (citing *Smith v. Illinois,* 469 U.S. 91, 95, 105 S.Ct. 490, 83 L.Ed.2d 488 (1984)).

■ The United States Supreme Court has held that "interrogation" includes not only express questioning, but also its functional equivalent. *Rhode Island v. Innis,* 446 U.S. 291, 301, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980). The Court stated, "the term 'interrogation' under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Id.* (footnote omitted). In determining whether police tactics were likely to elicit an incriminating response, we must focus our inquiry on the perceptions of the suspect rather than on the intent of the police, and must consider the totality of the circumstances surrounding the suspect's custody. *Id.; State v. Tibiatowski,* 590 N.W.2d 305, 310–11 (Minn.1999). Relying on *Innis,* we have said that "the central question becomes whether the evidence in the record shows that the officers should have known that their conversation was reasonably likely to elicit an incriminating response from [the suspect] or to get [the suspect] to revoke his right to counsel." *Munson,* 594 N.W.2d at 142.

The district court concluded that Earl voluntarily waived his right to counsel and ruled that his statement was admissible. The court found that Earl reinitiated contact and that the BCA officers' responses to Earl could not be characterized as interrogation intended to induce an incriminating statement. The court looked at the totality of the circumstances, including that Earl was older than 21, that he showed he understood his rights by initially invoking his right to counsel, that his admission to "previous juvenile matters" suggested prior experience with the criminal justice process, and that he understood that he was suspected in three violent deaths. The court also found that the

BCA agents' comments merely invited Earl to think about his situation and draw his own conclusions, and that the totality of the circumstances indicated that Earl did not interpret the BCA agents' statements as promises of leniency, either express or implied. Therefore, the court denied Earl's motion to suppress his statement.

We conclude that the district court's findings were not clearly erroneous and we determine that Earl's waiver of his right to counsel was voluntary. The record demonstrates that Earl reinitiated contact with police after initially invoking his right to counsel. The totality of the circumstances shows that he knowingly and intelligently revoked the invocation of his right to counsel. First, Earl essentially turned himself in for the purpose of speaking to the police, and he came to the interrogation with that predisposition. Second, the police properly terminated the interrogation as soon as Earl invoked his right to counsel. They did not attempt to persuade him to revoke that invocation; to the contrary, they reinforced his need for counsel because of the serious charges he was facing. Third, there was a 2–hour break in the interrogation while police waited for Todd County authorities to take custody of Earl. Fourth, police did not return to the interrogation room until after Earl had asked to speak with them. Fifth, although the suggestion by police that it was in Earl's best interest to talk to them comes dangerously close to impermissible interrogation and should have been avoided, we ultimately conclude that it did not defeat the voluntariness of Earl's waiver because it was made only in response to his direct question and in a manner that made it clear that the decision was Earl's to make. Finally, police made no promises to induce Earl's revocation.

Under these circumstances, we hold that Earl's statement was voluntary and that the district court did not err in denying Earl's motion to suppress his statement.

## II.

Although Earl did not object to the jury instructions at trial, he now argues that the instructions on accomplice liability materially misstated the law, resulting in plain error affecting his substantial rights such that his right to a fair trial was compromised.

 Failure to object to jury instructions generally results in a waiver of the issue on appeal. *State v. Crowsbreast*, 629 N.W.2d 433, 437 (Minn.2001). However, we have discretion to examine instructions that were not objected to at trial "if the instructions contain plain error affecting substantial rights or an error of fundamental law." *Id.; State v. White*, 684 N.W.2d 500, 508 (Minn.2004). We analyze jury instructions "with the understanding that trial courts possess significant discretion in the selection of instruction language and that instructions must be read as a whole to determine whether they accurately describe the law." *State v. Smith*, 674 N.W.2d 398, 402 (Minn.2004).

The district court's instructions on accomplice liability followed those recommended in the Jury Instruction Guide as follows:

> If the defendant intentionally aided another person in committing a crime, * * * the defendant is also guilty of any other crime the other person commits while trying to commit the intended crime, if that other crime was reasonably foreseeable as a probable consequence of trying to commit the intended crime.

10 Minn. Dist. Judges Ass'n, *Minnesota Practice—Jury Instruction Guides, Crim-*

*inal,* CRIMJIG 4.01 (4th ed.1999). Earl argues that this instruction conflicts with the requirements of the accomplice liability statute, which reads as follows:

> A person liable under subdivision 1 [for aiding and abetting] is also liable for any other crime committed in pursuance of the intended crime if reasonably foreseeable *by the person* as a probable consequence of committing or attempting to commit the crime intended.

Minn.Stat. § 609.05, subd. 2 (2004) (emphasis added).

Earl argues that the statutory requirement that the crime be "reasonably foreseeable by the person" imposes a subjective standard for accomplice liability. Earl relies on an advisory committee note to the statute to show that the legislature intended to impose a subjective standard: "[This statute] is * * * consistent with the philosophy of personal fault underlying criminal liability that a person should not be liable for crimes not intended by him * * * unless they were reasonably foreseeable by him." Minn.Stat. Ann. § 609.05 advisory comm. cmt.—1963 (West 2003).

The state counters that the language of CRIMJIG 4.01 was approved in two prior cases and there is no need to revisit this issue. Alternatively, the state argues that there is no functional difference between "reasonably foreseeable by the person" in the statute and "reasonably foreseeable" in the jury instruction.

We have reviewed the language of CRIMJIG 4.01 in two cases and in both instances found the instruction to be not erroneous. *See White,* 684 N.W.2d at 509 (holding that jury instructions identical to the ones used in this case, when read as a whole, did not confuse or mislead the jury or materially misstate the law); *State v. Peirce,* 364 N.W.2d 801, 809–10 (Minn. 1985) (holding that the "reasonable foreseeability" test for accomplice liability did

not allow jurors to return a verdict on something less than proof beyond a reasonable doubt). Our holding in *White* rejected the specific contention that it was error to omit the words "by the person" in the instructions. *See White,* 684 N.W.2d at 509.

■ In addition, in several other decisions since at least 1988 we have consistently recast the words of the statute, omitting the phrase "by the person." *See, e.g., State v. Pierson,* 530 N.W.2d 784, 789 (Minn.1995) (after quoting the accomplice liability statute, summarizing the elements of proof under the statute, including the requirement that the state must show that "the murder was reasonably foreseeable as a probable consequence of the intended crime"); *State v. Russell,* 503 N.W.2d 110, 114 (Minn.1993) (stating "[a]mple evidence also exists to demonstrate that [the victim's] death was committed in furtherance of the aggravated robbery and that the murder was a reasonably foreseeable probable consequence of the robbery"); *State v. Merrill,* 428 N.W.2d 361, 367 (Minn. 1988) (stating "[a] person may also be held liable for the crimes of an accomplice under subdivision 2 if the accomplice's crime was * * * a reasonably foreseeable consequence of the intended crime"). Moreover, we disagree with Earl's contention that the words "reasonably foreseeable by the person" in the statute impose a subjective standard. The standard would be subjective if the statute merely said "foreseeable by the person," but the word "reasonably" implies some degree of objectivity.

■ Further, the state's theory of the case throughout the trial was that the murders were reasonably foreseeable to Earl, based on extensive testimony about his past association with Carpenter. For

example, in its closing argument, the state said:

> [Earl] admitted that he aided and abetted Mr. Carpenter in [the burglary]. Well, but he didn't think Mr. Carpenter would kill the Chromeys [sic] or the Zapzalkas that night. That's what he said. But then when he went further—and you heard his words—he said something different, didn't he? Consider that defendant told Dombrovski, they will take care of business before this happened. Clearly, he was already foreseeing what the future might bring if there were problems at a house. Murder was certainly foreseeable in the plans that the Jack Boys had when they went into a house. It was foreseeable. Defendant told Raelynn Jones, "We kill people." Again, foreseeable that people would be killed.

Thus, even if the statute had mandated a subjective standard, the state's evidence satisfied that standard by focusing on what Earl himself foresaw.

We hold that, under the circumstances of this case, the district court did not err in basing the jury instructions on CRIMJIG 4.01. To avoid the necessity of dealing with this issue in the future, we suggest that all future instructions on accomplice liability use the entire statutory phrase "reasonably foreseeable to the person."[1]

### III.

Earl argues that the evidence was insufficient to convict him of aiding and abetting first-degree murder while committing kidnapping and aiding and abetting first-degree murder while committing criminal sexual conduct. Earl claims that the evidence of kidnapping was insufficient because the confinement was incidental to the commission of the burglary, and that the evidence of criminal sexual conduct was insufficient because Katie Zapzalka's rape was not reasonably foreseeable as a probable consequence of the burglary. The state counters that Earl applies the wrong analysis because the felony underlying both convictions was murder, not burglary.

In reviewing an appeal alleging insufficient evidence, this court must review the record to determine whether the evidence, viewed in the light most favorable to the conviction, is sufficient to permit the jurors to reach their verdict. *State v. Smith*, 669 N.W.2d 19, 30–31 (Minn.2003).

### A. Kidnapping

For a court to convict a defendant of kidnapping, the state must show that the defendant has confined or removed the victim from one place to another without that person's consent. Minn. Stat. § 609.25, subd. 1 (2004). The "confinement or removal must be criminally significant in the sense of being more than merely incidental to the underlying crime, in order to justify a separate criminal sentence." *Smith*, 669 N.W.2d at 32. Earl argues that the evidence was insufficient to show that he and Carpenter confined or removed their victims other than incidentally to the burglary they intended to commit. Earl argues that because his victims were confined merely to keep them out of

---

1. Earl also argues that the district court should have included a reference to reasonable foreseeability in connection with each of the charged offenses. But instead of describing the reasonable foreseeability requirement within the instructions for each offense, the district court made a preliminary description of reasonable foreseeability that applied to all offenses. When viewed in their entirety, the instructions did not confuse or mislead the jury and were a correct statement of the law.

the way while he committed burglary, no kidnapping occurred.

Although the confinement or removal in this case may have been necessary to commit the burglary, it was not merely incidental. Earl testified that he awoke the Chromey family and removed them to the kitchen, bound them with electrical tape, and stood by while Carpenter searched the house for valuables. This is purposeful behavior in its own right. It constitutes criminal conduct distinct from the burglary, the criminal sexual conduct, or the murders of Chromey and her children. Therefore, we conclude that the evidence was sufficient to support the verdict of guilty of aiding and abetting first-degree murder while committing kidnapping.

## B. Criminal Sexual Conduct

To show accomplice liability for aiding and abetting first-degree murder while committing criminal sexual conduct, the state must prove, among other things, that the person aided by the defendant caused the victim's death, and, at the time of the victim's death, the person aided by the defendant was committing first-degree criminal sexual conduct with force or violence. Minn.Stat. § 609.05; Minn.Stat. § 609.342 (2004). The state could prove that Earl aided and abetted Katie Zapzalka's rape by showing either that Earl "had a knowing role in the commission of the crime and did nothing to thwart its completion," or that the crime was reasonably foreseeable by Earl as a probable consequence of committing or attempting to commit the crime intended. *State v. Arrendondo*, 531 N.W.2d 841, 845 (Minn. 1995); Minn.Stat. § 609.05, subds. 1–2 (2004).

Earl argues that he did not have a knowing role in the commission of first-degree murder while committing criminal sexual conduct. He claims that the rape came as a "complete surprise," and that he learned of it only afterward. He also claims that criminal sexual conduct was not reasonably foreseeable to him as a consequence of the burglary he intended to commit. The state argues that because Earl took no action to thwart Katie's murder, and because he played a knowing role in the overall chain of events leading to her murder, Earl should be held liable for Carpenter's criminal sexual conduct as well.

Although Earl testified that he was unaware of the rape until after the fact, he also admitted that he saw Carpenter remove Katie Zapzalka from the kitchen and lay her on her bed. He also admitted that by the time he saw Carpenter put Katie on the bed, he knew there was nothing worth stealing in the house. He further admitted that he stood guard in the living room while Carpenter returned to the bedroom after incapacitating Chromey and Jerrod Zapzalka. Viewing the evidence in a light most favorable to the conviction, the jury reasonably could have found that the only reason Carpenter told Earl to stand guard was to prevent the interruption of the rape. We hold that the evidence was sufficient to support the verdict of guilty of aiding and abetting first-degree murder while committing criminal sexual conduct.

## IV.

Earl argues that seven of his convictions must be vacated because a person cannot be convicted multiple times based on the same conduct against the same victim. Minn.Stat. § 609.04 (2004); *State v. Pippitt*, 645 N.W.2d 87, 96 (Minn.2002) (holding that the defendant could not be convicted of two counts of murder for the same act against the same victim). The state agrees, but points out that the underlying guilty verdicts should remain in force for each of these seven counts. *See*

*State v. Pflepsen*, 590 N.W.2d 759, 766 (Minn.1999) (holding that the underlying guilty verdict of a lesser-included crime remains intact and the district court may later convict and sentence on that crime if a separate adjudicated conviction is later vacated). Accordingly, we vacate Earl's convictions under counts 1 through 6 and 8, recognizing that the jury verdicts on those counts remain in force.

Affirmed in part; vacated in part.

ANDERSON, Paul H., Justice (concurring).

I concur in the result reached by the majority and its reasoning on all of the issues except for part of its conclusion regarding Minn.Stat. § 609.25, subd. 1 (2004), the kidnapping statute. The majority reads this statute too broadly when it concludes that the placement and confinement of the Chromey family members in the kitchen of their home was not incidental to the burglary and thus constitutes kidnapping. Therefore, I would vacate Christopher Earl's conviction under Count 7 (murder of Hollis Chromey while committing kidnapping) and Count 9 (murder of Jerrod Zapzalka while committing kidnapping), and remand for sentencing under either Count 1 or 4 (aiding and abetting the first-degree premeditated intentional murder of Chromey, or aiding and abetting the first-degree murder of Chromey while committing a burglary), and for sentencing under either Count 3 or 6 (aiding and abetting the first-degree premeditated intentional murder of Jerrod Zapzalka, or aiding and abetting the first-degree murder of Jerrod Zapzalka while committing burglary).

MEYER, Justice (concurring).

I write separately to note my disagreement with the majority's conclusion that Earl voluntarily waived his right to counsel and that therefore his videotaped statement was properly admitted. I believe the police engaged in improper interrogation of Earl before he revoked his right to counsel. This interrogation was in direct violation of the *Miranda* prohibition and rendered the statement constitutionally inadmissible. Nevertheless, I would conclude that the admission of the statement was harmless error and, therefore, I concur in the result.

In *Rhode Island v. Innis*, the United States Supreme Court stated that "the term 'interrogation' under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." 446 U.S. 291, 301, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980) (footnotes omitted). The Court noted that its concern in *Miranda* was that the "interrogation environment" created by the interplay of interrogation and custody would "subjugate the individual to the will of his examiner" and undermine the privilege against compelled self-incrimination. *Id.* at 299, 100 S.Ct. 1682 (citing *Miranda v. Arizona*, 384 U.S. 436, 457–58, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966)).

In *Edwards v. Arizona*, the Supreme Court held that once a suspect has invoked the right to counsel, the police are completely barred from further interrogation until counsel is provided. 451 U.S. 477, 484–85, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981). The Court noted that "[h]ad [the suspect] initiated the meeting [the next day], nothing in the Fifth and Fourteenth Amendments would prohibit the police from merely listening to his voluntary, volunteered statements and using them against him at trial." *Id.* at 485, 101 S.Ct. 1880. In a footnote, the Court considered

the probability that in such a meeting initiated by the suspect, the conversation would not be entirely one-sided and the police would likely engage in some sort of interrogation:

> In that event, the question would be whether a valid waiver of the right to counsel and the right to silence had occurred, that is, whether the purported waiver was knowing and intelligent and found to be so under the totality of the circumstances, including the necessary fact that the accused, not the police, reopened the dialogue with the authorities.

*Id.* at 486 n. 9, 101 S.Ct. 1880.

This court has stated that the *Edwards* analysis is concerned with whether the suspect invoked his or her right to counsel during a custodial interrogation, whether the suspect then initiated further discussions with police, and whether the suspect knowingly and intelligently waived the right invoked. *State v. Munson,* 594 N.W.2d 128, 138–39 (Minn.1999). This court has extended protections to suspects that are in addition to those described in *Edwards,* and it is these additional protections that the majority fails to address and that are dispositive for this case.

In *Munson,* we considered a situation where, after invocation of the right to counsel, police kept interacting with a suspect and the suspect revoked the right to counsel. 594 N.W.2d at 133. We stated that "the central question becomes whether the evidence in the record shows that the officers should have known that their conversation was reasonably likely to elicit an incriminating response from [the suspect] *or to get [the suspect] to revoke his right to counsel.*" *Id.* at 142 (emphasis added). In *Munson,* the suspect unequivocally invoked his right to counsel, upon which the interrogating officers did stop asking him questions, but began speaking

to each other about federal drug charges and a "window of opportunity" to talk that was "closing quickly." *Id.* at 133. When Munson questioned them about what they meant, the officers informed him repeatedly that they could not talk to him unless he revoked his right to a lawyer. *Id.* at 133–34. Eventually, Munson agreed to revoke his right and made a statement. *Id.* at 134. Our analysis focused on whether the police engaged in impermissible interrogation before Munson reinitiated the conversation by asking them a question, and hinged on whether the state sustained its burden of proving that the officers' comments to each other consisted of "innocent banter." *Id.* at 140–41. We noted the district court's finding that the officers' statements were " 'designed to [pique] Munson's curiosity and ultimately to elicit from him a retraction of his * * * request to consult with an attorney.' " *Id.* at 142. We agreed, holding that the state did not meet its burden and that the district court erred in not suppressing Munson's statements. *Id.* at 143.

In *State v. Hannon,* we cited the *Edwards* caution that "additional safeguards [are] necessary when an accused asks for counsel" and held that police must "limit their questions to ones designed to clarify the [suspect's] desires regarding the presence of counsel." 636 N.W.2d 796, 806 (Minn.2001) (citing *Edwards,* 451 U.S. at 484, 101 S.Ct. 1880). We held that the police's comments amounted to improper interrogation when, immediately after Hannon invoked his right to counsel, the police told him, "Your side of this story will never be known." *Id.* at 805.

*Munson* and *Hannon,* read together, mandate that until a suspect revokes a previously invoked right to counsel, the police are forbidden to engage in words or conduct that they should know are reasonably likely to elicit an incriminating re-

sponse from the suspect, or to get the suspect to revoke the right to counsel. Stated another way, what the police say or do after the suspect reinitiates contact is central to our analysis. Here, Earl asked the police point-blank how "this [was] going to help me out, talking to you guys without talking to an attorney." The police appropriately responded that they could not advise Earl. Earl persisted in wanting to know whether talking to the police without an attorney would help him. The police responded by saying:

> Well look at it this way. You know if you were a prosecutor or judge and jury and you had two individuals, one individual that says I made a terrible terrible mistake but I'm willing to accept the consequences and do the right thing, you have the other individual that says, "Go to hell." "Prove it." You know which one do you look more favorably on, it's just kind of common sense.

The police then said they would not disclose what Earl's girlfriend told them and "[t]he only way we can judge your truthfulness and your honesty with us, is for you to tell us and that's the important part, and that's going to show your cooperation." The police suggested that by talking to them without an attorney, Earl would be demonstrating "cooperation" and that his "cooperation" would be viewed favorably by the prosecutor, judge, and jury. As in *Munson*, this was not "innocent banter." As in *Munson*, no direct threat or promise of favorable treatment was made, but the appeal to Earl's "common sense" was a time-honored rhetorical device designed for the purpose of inducing him to revoke his right to counsel.[1] As in *Munson*, it was designed to pique Earl's interest and elicit a retraction of his re-

quest for counsel. Because the police used words intended to induce Earl to revoke his right to counsel, and Earl then immediately revoked his right to counsel, this inducement constituted a clear violation of Earl's rights under *Miranda*.

Under these circumstances, where the police induce a suspect to revoke a previously invoked right to counsel, the appropriate remedy is to suppress the statement. *See, e.g., Edwards*, 451 U.S. at 487, 101 S.Ct. 1880. For this reason, I would hold that the district court erred in denying Earl's motion to suppress his statement and would perform a harmless error analysis.

Criminal convictions will not be overturned if the error was harmless beyond a reasonable doubt. *State v. Staats*, 658 N.W.2d 207, 215 (Minn.2003). To meet this standard, the verdict must be "surely unattributable" to the error. *Id.* To determine whether a verdict was surely unattributable to an error, this court must consider "the manner in which the evidence was presented, whether it was highly persuasive, whether it was used in closing argument, and whether it was effectively countered by the defendant." *State v. Al–Naseer*, 690 N.W.2d 744, 748 (Minn.2005). In addition, this court must determine whether the evidence of guilt is strong enough to convict the defendant without the use of the statement. *See id.*

Earl argues that the state made repeated and effective use of the statement, painting Earl as a cold-blooded, remorseless killer. The state focuses on the other evidence of Earl's guilt, claiming that it is overwhelming even without the statement. But as we stated in *Al–Naseer*, we must consider all of these factors.

---

**1.** The state does not argue that Earl's cooperation actually did result in more favorable treatment at trial, or that the police thought

Earl's cooperation would result in more favorable treatment. Indeed, there is no legal authority for such a proposition.

The state's theory of the case was that Earl went to Long Prairie with the intent to commit a burglary, and that given what he knew about Carpenter and the circumstances of previous burglaries the pair had committed, he should have anticipated the likelihood that death would occur. The majority of the videotaped statement, including Earl's admissions that he went to Long Prairie to burglarize and that he knew Carpenter had killed others, was corroborated by Earl in his trial testimony. In those few instances where the state used the statement to impeach Earl's testimony, the state was introducing an alternative theory of the case in which Earl was an active participant.[2] The state referred to Earl's statement briefly in its closing arguments, mentioning it only three times in the more than 30 transcript pages. In addition, Earl was given the opportunity to explain any discrepancies between the statement and his testimony.

The circumstantial evidence against Earl was overwhelming. Numerous friends and acquaintances testified about Earl's activities and statements in the days before and after the Long Prairie killings. Earl's own testimony placed him inside the Chromey residence after buying masks and gloves, stealing heavy flashlights, attempting to steal guns, buying and marking a map with the location around Long Prairie, and purchasing electrical tape. No physical evidence placed him inside the Chromey residence, but his vehicle contained a large quantity of physical evidence connected to the crime.

Between the evidence and testimony presented by the state and Earl's own testimony, the evidence of guilt was strong enough to support guilty verdicts without

Earl's statement. Taking all of the factors of the *Al–Naseer* test into consideration, any error committed by the district court in admitting Earl's custodial statement was harmless beyond a reasonable doubt.

I would hold that the district court erred in denying Earl's motion to suppress his statement, but because the error was harmless, I agree with the majority's conclusion that Earl's conviction should be upheld.

---

**2.** The state used the statement to impeach Earl's testimony on whose idea it was to burn evidence at his uncle's northern Minnesota property and on whether he had hit any of the victims. In his statement, he said he hit Chromey; at trial, he clarified that he deflected the chair with which she came at him.