STATE of Minnesota, Respondent,

v.

Jamie Leigh LARSON, Appellant.

No. A05–0031.

Supreme Court of Minnesota.

Sept. 2, 2010.

594

Lori Swanson, Attorney General; and Susan Gaertner, Ramsey County Attorney, Thomas R. Ragatz, Assistant County Attorney, St. Paul, MN, for respondent.

Craig E. Cascarano, Cascarano Law Office, Minneapolis, MN, and Jennifer M. Macaulay, Macaulay Law Offices, LLC, St. Paul, MN, for appellant.

## OPINION

GILDEA, Chief Justice.

Appellant, Jamie Leigh Larson, appeals her conviction under Minn.Stat. §§ 609.05 and 609.185 (2008) of aiding and abetting the first-degree premeditated murder of Thomas John Cady.[1] Larson's brother, Robert Larson, was convicted in a separate trial of the first-degree premeditated murder of Cady.[2] Larson argues that she is entitled to a new trial based on several evidentiary and jury-instruction errors. She also argues that the evidence at trial was insufficient to support her conviction. We affirm Larson's conviction.

The evidence at trial established the following facts. Ramsey County Sheriff's deputies found Cady's body just before 9:00 a.m. on the day after Thanksgiving, November 28, 2003, beside Edgerton Street in Little Canada. Cady had been strangled using a zip strip[3] and had been dragged into a ditch by the side of the road.

During their investigation into Cady's death, the police learned that, earlier in the morning of November 28, Larson and her brother, Robert, were at the Travelodge hotel in St. Paul, visiting acquaintances who were staying in two rooms at the hotel and using drugs. Larson's cousin, Dan Iacarella, and Larson's friends, D.G. and J.S., were in room 208. Everyone in this room had been using either methamphetamine or painkillers that morning. Larson and Robert, who had both also been using methamphetamine, entered the room and began complaining about Larson's boyfriend, Cady, having abused Larson. Witnesses at trial testified that the two discussed getting back at Cady, who was then sleeping in his truck in the parking lot of the hotel, by tying

---

1. Minnesota Statutes § 609.05, subdivision 1, provides:

   A person is criminally liable for a crime committed by another if the person intentionally aids, advises, hires, counsels, or conspires with or otherwise procures the other to commit the crime.

   Minnesota Statutes § 609.185 provides, in relevant part:

   (a) Whoever does any of the following is guilty of murder in the first degree and shall be sentenced to imprisonment for life:

   (1) causes the death of a human being with premeditation and with intent to effect the death of the person or of another.

2. For purposes of clarity, we refer to Jamie Larson as "Larson" and Robert Larson as "Robert."

3. Sometimes called a "zip tie" or "cable tie," a zip strip is a plastic strip that forms a loop with a one-way ratchet that can tighten but not loosen.

him up with zip-strips, possibly shooting him, and taking him north to Pine City to bury his body. Larson then left room 208 while Robert went to get some zip-strips from Iacarella who used them for his job.

Larson next went to room 206 where Ramon Andujar, and two others, T.O. and R.A., were. According to Andujar's testimony, Larson made more threats against Cady, and again complained that he had abused her. Larson asked Andujar to come with her to take revenge on Cady. Andujar refused. Larson then left room 206.

Andujar followed Larson a few minutes after she left. He claimed he followed to try to stop her from hurting Cady. Andujar testified that when he left his room he saw Larson and Robert walking down the stairs towards the parking lot where Cady was sleeping in his parked truck. Andujar said that he saw Robert carrying a zip strip and that he then went to get Iacarella to come with him to stop Larson and Robert.

According to trial testimony, once in the parking lot, Larson got into the driver's seat of Cady's truck, and Robert sat behind the front passenger seat where Cady was still sleeping. Larson then drove out of the parking lot, and Andujar and Iacarella followed shortly thereafter in Andujar's SUV. Andujar followed Larson west on I–94 then north on I–35 and then off the exit for Little Canada Road. Larson next took a right onto Edgerton Street, but Andujar lost sight of the truck and did not immediately follow. Andujar turned the SUV around and eventually spotted Cady's truck again on Edgerton Street.

Andujar testified that soon after he located Cady's truck, he saw Larson coming towards his SUV and stopped for her. Andujar then followed Larson's directions to pick up Robert, who was close by.

Andujar said that he next drove to a White Castle in Blaine where Robert's car was parked. At the White Castle, Larson got out of the SUV and into Robert's car. According to trial testimony, Larson then drove to the apartment of J.H., a man with whom she had recently become romantically involved. With Robert and Iacarella still in his SUV, Andujar drove to a gas station near the Travelodge. Robert got out at the gas station and apparently walked back to the hotel.

D.G. testified at trial that when Robert arrived at the hotel he washed his bleeding hands and changed his clothes. Someone at the hotel eventually gave Robert a ride to J.H.'s apartment where Robert and Larson told J.H. what had happened to Cady. Based on what Larson and Robert told him, J.H. testified that during the period when Andujar had lost sight of Cady's truck, Robert fastened a zip-strip around Cady's neck and Cady awoke. Robert and Cady struggled inside and then outside the truck, and eventually Robert choked Cady to death.

After an investigation by the Ramsey County Sheriff's office, a grand jury indicted Robert on charges of first-degree premeditated murder as well as second-degree murder. The grand jury indicted Larson on charges of aiding and abetting first-degree premeditated murder as well as aiding and abetting second-degree murder.

After a jury trial, Larson was convicted of aiding and abetting first-degree premeditated murder. She was sentenced the same day to life imprisonment. Larson appealed her conviction to this court.[4] In

---

**4.** Larson has also twice been denied postconviction relief, but does not appeal her denials of postconviction relief here.

this appeal, Larson argues that the district court made several erroneous evidentiary rulings that deprived her of her right to present a complete defense. She also argues that the district court made several errors in its instructions to the jury. Finally, Larson argues that the evidence at trial was insufficient to support her conviction.

## I.

We first address Larson's contention that the district court made erroneous evidentiary rulings, the cumulative effect of which was to deprive her of the opportunity to present a complete defense. A district court's exclusion of evidence is error if the exclusion is based on an abuse of discretion. *State v. Gutierrez*, 667 N.W.2d 426, 436 (Minn.2003). Even if a district court abuses its discretion in excluding evidence, any error is harmless unless there is a "reasonable possibility that the verdict might have been different if the evidence had been admitted." *State v. Post*, 512 N.W.2d 99, 102 (Minn.1994).

Larson argues that the district court abused its discretion by excluding certain alternative perpetrator evidence. She further argues that the district court abused its discretion by excluding evidence of Andujar's immigration status and deportation hearing as well as by excluding extrinsic evidence of Andujar's alleged criminal conduct. Finally, Larson contends that the district court abused its discretion by limiting her use of unauthenticated transcripts of law-enforcement witness interviews. Larson asserts that the cumulative effect of these errors deprived her of the opportunity to present a complete defense. We address each of Larson's arguments in turn.

### A.

In response to a pretrial defense motion, the district court ruled that Larson would not be able to present alternative perpetrator evidence that B.E. and J.H. had motive to murder Cady. Larson wanted to introduce evidence that Cady had possibly burglarized B.E.'s house and had threatened to kill B.E. when confronted about it. Larson also wanted to introduce evidence that shortly before Cady's murder, Cady had found Larson and J.H. together in J.H.'s apartment in some state of undress, that Cady had then threatened J.H. and J.H.'s children, and that J.H. responded by leaving a voicemail on Cady's phone threatening to kill Cady. When J.H. testified at trial, Larson's counsel tried to question J.H. about the alleged threats, but the district court sustained the State's objection because the court had already ruled the evidence inadmissible.

Larson argues that the district court abused its discretion when it excluded evidence of B.E.'s and J.H.'s possible motives to kill Cady. The State argues, as the district court concluded, that Larson did not proffer sufficient evidence that had the inherent tendency to connect either B.E. or J.H. to Cady's murder as alternative perpetrators.

Larson, like all defendants accused of criminal behavior, "has the constitutional right to present a complete defense." *State v. Atkinson*, 774 N.W.2d 584, 589 (Minn.2009). Included within this right is "the right to present evidence showing that an alternative perpetrator committed the crime with which the defendant is charged." *Id.* Such evidence is generally not admitted "for the purpose of establishing the alternative perpetrator's guilt, but to create a reasonable doubt as to the defendant's guilt." *Id.* at 590.

Alternative perpetrator evidence is admissible only if the defendant lays a proper foundation by proffering evidence

that has an "inherent tendency" to connect the alleged alternative perpetrator with the commission of the crime. *Id.* We require "proper foundation" in order "to 'avoid[ ] the use of bare suspicion and safeguard[ ] the third person from indiscriminate use of past differences with the deceased.'" *Id.* (quoting *State v. Hawkins,* 260 N.W.2d 150, 159 (Minn.1977)) (alterations in original). The foundation requirement also avoids "the consideration of matters collateral to the crime." *Hawkins,* 260 N.W.2d at 159.

■ Here, Cady's threat against B.E. does not have an inherent tendency to connect B.E. with Cady's murder. Larson proffered no evidence that B.E. was anywhere near the crime scene or even made threats against Cady. A threat *by a murder victim* against a third party does not have the inherent tendency to connect that third party to the crime. We therefore hold that the district court did not abuse its discretion in excluding evidence of B.E. as an alternative perpetrator.

Similarly, Larson proffered no evidence linking J.H. to the scene of Cady's murder.[5] Larson did, however, proffer evidence that, a few days before the murder, J.H. responded to Cady's threats to harm J.H. and J.H.'s children with his own threat to kill Cady. But Larson did not proffer any evidence connecting J.H. in any way to the events leading up to the murder, any evidence showing he was at or near the murder scene, or any evidence that he had the opportunity to murder Cady. Evidence of motive alone does not have the inherent tendency to connect a third party to the commission of the crime. *See, e.g., Beaty v. Commonwealth,* 125 S.W.3d 196, 208 (Ky.2003). Based on this

record, and giving due regard to the district court's discretion in determining whether an adequate foundation exists, we hold that the court did not abuse its discretion in excluding evidence of J.H. as an alternative perpetrator.

### B.

■ We turn next to Larson's argument that the district court abused its discretion by excluding evidence of Andujar's deportation hearing and status as an illegal immigrant and by excluding extrinsic evidence of the fact that law enforcement officials found methamphetamine residue and equipment for making forged identifications in Andujar's hotel room. Larson asserts that this evidence is probative of Andujar's bias and should have been admitted. The State contends that the evidence is not probative of bias, as there was no evidence that Andujar was receiving any consideration from the government for his testimony. The State further contends that any probative value of Andujar's deportation hearing is outweighed by its potential for prejudice.

■ Evidence of bias of a witness is admissible to attack the credibility of a witness. Minn. R. Evid. 616. We recognize however that "not everything tends to show bias, and courts may exclude evidence that is only marginally useful for this purpose. The evidence must not be so attenuated as to be unconvincing because then the evidence is prejudicial and fails to support the argument of the party invoking the bias impeachment method." *State v. Lanz–Terry,* 535 N.W.2d 635, 640 (Minn. 1995). And the district court may exclude any evidence, although relevant, for which

---

**5.** Larson implies a jacket found at the murder scene might have belonged to J.H. But there was no evidence presented at trial that the jacket belonged to J.H. To the contrary, the evidence in the record suggests that the jacket had been worn by Cady on the morning of his murder.

the danger of unfair prejudice or misleading the jury substantially outweighs its probative value. Minn. R. Evid. 403.

Here, the evidence of Andujar's immigration status and deportation hearing and the fact that Andujar was not charged with possession of methamphetamine or false-document-making equipment did not support Larson's efforts to invoke the bias impeachment method. It is undisputed that Andujar was not given any consideration for his testimony, either at his deportation hearing or with the lack of charges for the contraband. We therefore hold that the district court did not abuse its discretion by excluding evidence of Andujar's deportation hearing and status as an illegal immigrant, or by excluding extrinsic evidence of alleged, uncharged criminal conduct.

### C.

■ Larson next argues that the district court erred when it limited her use of unauthenticated transcripts of law enforcement interviews of State witnesses. The transcripts in question had been prepared by Larson's counsel using audio tapes disclosed to Larson by the State. Larson's counsel did not attempt to have the transcripts reviewed by the relevant law enforcement officers before trial. Nor did Larson's counsel attempt to call the relevant law enforcement officers as witnesses to authenticate the transcripts. The district court ruled that Larson would not be able to use the unauthenticated transcripts as evidence, but would be able to cross-examine State witnesses using information from the transcript—e.g., "Did you make X statement in your interview with officer Y?"

From her briefing, it appears that Larson is arguing both that the district court should have admitted the unauthenticated transcripts as substantive evidence, and that the court erred in not allowing her to use the transcripts to impeach witnesses based on statements they had earlier made to law enforcement officers. We address each argument in turn.

We first address whether the district court erred in excluding the unauthenticated transcripts as substantive evidence. Larson does not dispute that transcribed law enforcement interviews require authentication before admission as substantive evidence. Minnesota Rule of Evidence 901(a) states that such material must be authenticated by offering "evidence sufficient to support a finding that the matter in question is what its proponent claims." Larson made no attempt to offer any evidence that the transcripts prepared by her counsel were accurate records of the witness interviews. Thus, to the extent that Larson is arguing that the transcripts should have been admitted as substantive evidence, we hold that the district court did not err in excluding them as such.

■ We also reject Larson's alternative argument that she is entitled to a new trial because she was not able to use the transcripts for impeachment purposes. We need not decide in this case whether the district court erred in declining to order the police to authenticate Larson-prepared transcripts of the interviews with witnesses. *See State v. Graham,* 764 N.W.2d 340, 355 (Minn.2009) ("Ideally, a transcript of C.H.'s interview should have been prepared by the State, or, alternatively, the transcript made by defense counsel should have been provided to the State for verification, or the district court should have either ordered the State to verify the relevant parts of the transcript or permitted introduction of the tape."). We do not have to reach this issue because any error was harmless.

Larson had ample opportunity to impeach the witnesses with the police reports, and she did so effectively. Moreover, Larson had access to the actual tape recordings of the witnesses' interviews with the police, which, unlike the transcripts, more fully reflected the witness' interviews by including important factors like the inflection in the speakers' voices. *See State v. Swanson*, 498 N.W.2d 435, 438–39 (Minn.1993) (explaining that use of tape recordings as evidence is preferable to reliance on transcripts of those tape recordings). Finally, Larson has not demonstrated that the transcripts would have provided impeachment opportunities that were not equally available to her through use of the tape recordings and the police reports. Because Larson had other information available from which to impeach the witnesses, we hold that any error regarding the transcripts was harmless.

In sum, we conclude that the cumulative impact of any evidentiary errors does not warrant granting Larson a new trial.

## II.

We turn next to Larson's argument that the district court made several reversible errors in instructing the jury. Specifically, Larson argues that the district court erred by instructing the jury with an unaltered version of CRIMJIG 4.01; by giving the jury a supplemental instruction on intent; and by failing to give the jury an instruction regarding uncorroborated accomplice testimony. We address each of Larson's arguments in turn.

## A.

▪ Larson argues that the district court erred when it instructed the jury on accomplice liability using CRIMJIG 4.01. CRIMJIG 4.01 reads as follows:

The defendant is guilty of a crime committed by another person when the defendant has intentionally aided the other person in committing it or has intentionally advised, hired, counseled, conspired with, or otherwise procured the other person to commit it. If the defendant intentionally aided another person in committing a crime or intentionally advised, hired, counseled, conspired with or otherwise procured the other person to commit it, the defendant is also guilty of any other crime the other person commits while trying to commit the intended crime, if that other crime was reasonably foreseeable as a probable consequence of trying to commit the intended crime.

10 Minn. Dist. Judges Ass'n, *Minnesota Practice—Jury Instruction Guides, Criminal*, CRIMJIG 4.01 (4th ed.1999). Specifically, Larson argues that the district court erred by using the above version of the jury instruction that uses the phrase "reasonably foreseeable," rather than the phrase "reasonably foreseeable to the person," as we suggested in *State v. Earl*, 702 N.W.2d 711, 722 (Minn.2005). Larson did not object to the use of the unaltered version at trial.

▪ We review unobjected-to jury instructions under a plain-error analysis. *State v. Vang*, 774 N.W.2d 566, 581 (Minn. 2009). The plain-error test requires: (1) an error; (2) that is plain; and (3) the error must affect the defendant's substantial rights. *State v. Griller*, 583 N.W.2d 736, 740 (Minn.1998). If those three prongs are met, we determine whether we need to correct the error to ensure fairness and the integrity of the judicial proceedings. *State v. Vance*, 734 N.W.2d 650, 662 (Minn.2007).

In *Earl*, we noted a discrepancy between CRIMJIG 4.01 and the accomplice-liability statute which it is meant to encapsulate, Minn.Stat. § 609.05, subd. 2 (2008). *See* 702 N.W.2d at 721. We held in *Earl*

that using only the phrase "reasonably foreseeable" was not error but suggested that "[t]o avoid the necessity of dealing with this issue in the future ... instructions on accomplice liability [should] use the entire statutory phrase 'reasonably foreseeable to the person.'" *Id.* at 722.

■■■■ We need not decide in this case whether the district court's use of the unaltered version CRIMJIG 4.01 was error that was plain because any error did not impact Larson's substantial rights. An error affects a defendant's substantial rights, under plain-error review, if there is a reasonable likelihood that giving the instruction had a significant effect on the verdict. *Griller,* 583 N.W.2d at 741. The defendant bears a heavy burden of persuasion on this prong of the plain-error test. *Id.*

Larson has not met this burden. Larson argues that the instruction was prejudicial because the jury was not asked to determine whether Cady's murder was reasonably foreseeable to her. But there was considerable evidence produced at trial that Larson specifically intended that Cady be murdered. Several witnesses testified at Larson's trial that Larson had expressed to them her desire to harm or kill Cady. R.A. testified that he heard Larson discuss taking revenge on Cady for abusing her. J.S. testified that she heard Larson and Robert discussing how they were angry with Cady and various ways they could possibly kill him. Andujar testified that Larson made a comment to him on the morning of the murder about "putting [Cady] six feet under." D.G. testified that he overheard Larson and Robert discussing binding Cady with duct tape or zip strips and also discussing putting a zip strip around Cady's neck. Considering this evidence, we cannot conclude that the jury would have reached a different verdict if they had been given a slightly al-

tered version of CRIMJIG 4.01 dealing with whether Cady's murder was reasonably foreseeable to Larson. We therefore hold that Larson has not met her burden to show that the court committed plain error affecting her substantial rights when it instructed the jury using the unaltered version of CRIMJIG 4.01.

### B.

Larson also argues that the district court erred by giving the jury an instruction on intent in addition to the recommended instruction on accomplice liability, CRIMJIG 4.01. Specifically, Larson takes issue with following sentence, which was included in the jury instructions: "A person's conduct before or after an offense is a relevant circumstance from which a person's criminal intent may be inferred." Larson objected to the instruction before it was given to the jury.

■■■■ A district court errs in instructing the jury if the challenged jury instruction confuses, misleads, or materially misstates the law. *State v. Vang,* 774 N.W.2d at 581. But a district court has considerable discretion in selecting jury instructions. *State v. Baird,* 654 N.W.2d 105, 113 (Minn.2002). We read the relevant jury instructions as a whole to determine if they accurately describe the law. *State v. Flores,* 418 N.W.2d 150, 155 (Minn.1988). Moreover, if the court erred in its instructions, we review the error to determine whether it was harmless. *State v. Pendleton,* 759 N.W.2d 900, 907 (Minn. 2009).

■■■■ We need not decide in this case whether the district court erred in giving the portion of the instruction at issue. An erroneous jury instruction is harmless if, beyond a reasonable doubt, the instruction had no significant impact on the verdict rendered. *State v. Mahkuk,*

736 N.W.2d 675, 682 (Minn.2007); *see also State v. Vance,* 765 N.W.2d 390, 394 (Minn. 2009) ("An erroneous jury instruction does not require a new trial if the error was harmless beyond a reasonable doubt." (quoting *Mahkuk,* 736 N.W.2d at 683) (internal quotations omitted)). Our review of the record establishes that any error in the portion of the instruction at issue had no significant impact on the verdict.

Larson argues that the instruction was erroneous because it only served to confuse the jury and that the objected-to instruction "is saying that someone's conduct before or after a criminal incident can somehow supplant or satisfy the element of intent." But even if that were the case, there was overwhelming evidence of Larson's intent in this case, as detailed above. All of the aforementioned evidence was admitted at trial, and all of it is probative of Larson's intent. The portion of the instruction at issue then did not have the effect of relieving the State of its obligation to prove Larson's intent. We therefore conclude that, beyond a reasonable doubt, the challenged instruction did not have a significant impact on the jury's verdict, and we hold that any error in giving the instruction was harmless beyond a reasonable doubt.

## C.

▆ Larson further argues that the district court erred in failing to instruct the jury that a conviction cannot be based on the uncorroborated testimony of an accomplice. Such an instruction must be given, whether requested or not, when an accomplice testifies in a criminal trial. *See* Minn.Stat. § 634.04 (2008); *Brown v. State,* 682 N.W.2d 162, 169 (Minn.2004). Larson's argument is based on the premise that Andujar was an accomplice to Cady's murder.[6] The State contends that because Larson presented alternative perpetrator evidence regarding Andujar, the accomplice instruction was not required under *State v. Evans,* 756 N.W.2d 854, 877 (Minn.2008). We agree.

▆ An accomplice instruction must be given if a witness could have reasonably been charged with and convicted of aiding and abetting the crime at issue. *Id.* But when a defendant presents evidence and argues at trial that a witness is an alternative perpetrator, that witness is not an accomplice as a matter of law, and an accomplice instruction is not required. *Id.*

Throughout her trial, Larson portrayed Andujar as an alternative perpetrator.[7] Larson's counsel cross-examined Andujar about an incident in which Cady pointed a gun at Andujar and tried to rob him of $1400. Larson's attorney proceeded to argue in closing that Andujar had motive and opportunity to kill Cady:

> When it comes to motive, Ladies and Gentleman, the State says the motivation for Jamie Leigh Larson to want T.J. Cady dead was the fact that he struck her one time.... Ramon Andujar, on the other hand, had a gun placed to his head [by Cady]. I believe the State's attorney described it as a pellet gun, but as we know from I believe it was Officer Dorr's testimony, that it was

---

6. Larson also appears to assert that the fact that Iacarella may have been an accomplice necessitated the instruction, but Larson is incorrect as Iacarella did not testify at trial.

7. In her brief, Larson asserts that "the trial court refused to allow the defense ... to submit any evidence that would tend to show that any of the State's witnesses might have been an uncharged third party perpetrator." Larson's assertion is untrue. As discussed above, Larson's counsel freely cross-examined Andujar at trial about his possible motive to kill Cady, and Larson's counsel argued in closing that Andujar could have been Cady's killer.

a very realistic looking weapon. In fact, it was a pellet gun but it was a replica firearm of a real handgun. Is that motivation? And where does that motivation take us?

[Andujar] and the mysterious Dan Iacarella, by [Andujar's] own account, were together that night. He and Dan Iacarella admit to being on Edgerton Road in the early morning hours of November 27th.

Because Larson portrayed Andujar as an alternative perpetrator, rather than as an accomplice at trial, an accomplice-liability instruction was not required. *See Evans,* 756 N.W.2d at 877; *State v. Swanson,* 707 N.W.2d 645, 653 (Minn.2006). We therefore hold that the district court did not err by failing to give the jury an instruction on accomplice testimony.

### III.

■ Finally, Larson argues that the State presented insufficient evidence to convict her of aiding and abetting first-degree premeditated murder. Specifically, Larson asserts that her conviction should be overturned because the circumstantial evidence presented at trial is consistent with a rational hypothesis other than guilt. That rational hypothesis, according to Larson, is that she never left the hotel on the morning of the murder. Larson's reliance on the circumstantial-evidence standard is misplaced.

In order to prove that Larson was guilty of aiding and abetting first-degree murder, the State had to demonstrate that Larson "intentionally aid[ed], advise[d], hire[d], counsel[ed], or conspire[d] with or otherwise procure[d]" Robert to intentionally murder Cady. Minn.Stat. § 609.05, subd. 1. The State did not prove these elements with circumstantial evidence; the State proved these elements directly. The State's evidence consisted of testimony

from witnesses who heard Larson recruiting people to help her kill Cady, saw her driving Robert and Cady away from the hotel after Robert was seen with the murder weapon, and heard her confess to the crime after it occurred. Larson's contention that she did not leave the hotel was one she was free to make to the jury, and one the jury was free to and did reject. *See State v. Leake,* 699 N.W.2d 312, 319 (Minn.2005) ("When reviewing a claim of evidentiary insufficiency, we view the evidence in the light most favorable to the verdict and assume that the factfinder disbelieved any testimony conflicting with that verdict."). Based on our careful review of the record, we hold that the evidence was sufficient to support Larson's conviction.

Affirmed.

STRAS, J., not having been a member of this court at the time of the argument and submission, took no part in the consideration of this case.